Price, J.
At the date of the delivery of the government bonds in question by Robert E. Finley to the First National Bank of New Comers-town, Ohio, it was just entering upon its career as a new banking corporation. It desired to issue some-of its circulating notes and in order to obtain permission to do so, was required to deposit with the comptroller of the currency, bonds of the United States as security for the circulation to be issued. Robert E. Finley was a stockholder in the bank and was the owner of five one thousand dollar registered bonds of the United States and $7,500 in coupon bonds, all being three per cent, bonds of the issue of June, 1898.
Negotiations were begun between the bank and Mr. Finley for the use of his bonds to deposit with the comptroller of the currency, which negotiations resulted in the execution of the following instruments: “Received of Robert E. Finley $12;-500 United States three per cent, bonds of the issue of 1898 (by act of June 13, 1898), to be deposited by this bank with the treasurer of the United States to secure its circulating notes, which said $12,500 three per cent, bonds this bank hereby agrees to return at any time upon demand, after sixty days’ -notice to the said Robert E. Finley, or their equivalent in lawful money of the United States, -should the said Robert E. Finley so elect, the price to be paid, if paid in money, to be the selling price of said bonds upon the day of delivery upon' the stock exchange in the city of *510 New York. When said bonds are returned $5,000 shall be registered and $7,500 shall be coupon.
“•First National Bank of New Comerstown,
“By A. M. Beers, Pres.,'
“C. E. Boden, Cashier.
“February 27, 1900.”'
Contemporaneous with the execution of the foregoing, the following instrument was executed:
“Coshocton, Ohio, Feb. 27, 1900.
“The First National Bank of New Comerstown, Ohio, agrees to pay the said Robert E. Finley the interest it receives from the United States treasurer on the $12,500 bonds delivered'by said Robert E. Finley to said bank on the 27th day of February, 1900, and $156.25 per annum additional during the time it holds them, payable quarterly, the first day of February, May, August and November in each year.”
This obligation is signed by the same officers who executed the first instrument, and the two constitute the whole agreement of the parties. Under the terms of these instruments two diverse claims are made- — -one by the treasurer, plaintiff below, that they show a sale of the bonds to the bank; the other by the executor of the will of Finley, that they constitute a bailment, the title to the bonds remaining in Finley during his life and in his executor thereafter until he elected to accept 'their value as provided in the latter part of the first instrument. Finley died on the 31st day of December, 1903, and on or about the first day of March, 1904, the executor, in pursuance of the contract directed said bank to sell the bonds *511 and pay oyer to him the proceeds of the sale, which was done on or about the 25th day of March, 1904, the sum realized being the then market f price on the stock exchange New York. The amount realized was $13,330, being a premium of $800. At thé same time, as shown by the evidence of the executor and not disputed, the bank paid him $39.06, being the rent of the bonds, for the preceding quarter or longer.
If there lurks in the candid mind any doubt about the true construction of said instruments under which the bonds were delivered to the bank, one or more additional facts properly appear in the record which may reflect the intention of the parties. Dr. A. M. Beers was then president of the bank, and in his testimony beginning on page 45 of the printed record, he says that “after careful investigation we found it cheaper to borrow, as we called it — to borrow bonds than to buy them. The premium upon the class of bonds required was so much better that we found it economy to borrow the bonds, expecting later to buy the bonds with the funds in hand — that there w.as a saving to the bank in so doing.” He also states that Finley was a stockholder in the bank arid interested in its economical management, and that they had other loans of bonds offered the bank. One Vogenitz was cashier of the bank when the bonds were sold on request of the executor. He testifies, in substance, that when the Finley bonds were sold, the bank had to buy other bonds to take their place, and he says, on page 57 of the printed record, that these new bonds purchased as a substitute for the Finley *512 bonds, were the first bonds that the bank ever purchased. It would seem from this statement and it may be fairly inferred, that the bonds delivered by Finley to the bank and by it deposited with the comptroller to secure the bank’s notes of circulation, remained intact as they were so deposited, until sold under the directions of the executor as above stated.
While it is true that the government required the deposit of registered bonds to secure circulation, and that only $5,000 of the Finley bonds were of that class, it is also true that the comptroller of the currency could and did convert the $7,500 of coupon bonds into the registered class without detriment to the owner or depositor. As to what effect such conversion would have upon the question of sale or bailment, we will consider later. But we think it very plain, that in 'the negotiations which led up to the delivery of these bonds to the bank, the conversion of the coupon bonds into registered bonds was contemplated, for that would be necesary in order to carry out the purpose of the delivery, and Finley will be presumed to have understood and consented to the inevitable course which would substitute $7,500 of three per cent, registered bonds for the three per cent, coupon bonds. Having knowledge that this change would be essential to accomplish the purposes of the bank, such change was, in effect, made h)*- his direction.
Under the terms of the written instrument and the attendant circumstances, was the transaction involved a sale, or was it a bailment? If a sale, the amount ($12,500) represented by the bonds *513 would be a credit subject to taxation, and as it was omitted from the returns for the years 1900, 1901, 1902 and 1903, the taxing authorities were not at fault for placing it upon the duplicate and endeavoring to collect the taxes. On the other hand, if the title to the bonds remained in Finley, they were not taxable under the law, and the circuit court is right in its judgment.
Let us test the case by the rules of law pertaining to sales. Authors on the subject of sales substantially agree that a sale is a contract founded on a money consideration, by which the absolute or general property in the subject of sale is transferred from the seller to the buyer, and that the essentials of a sale are: (1) a mutual agreement; (2) competent parties; (3) a money consideration; (4) a transfer of the absolute or general property from the seller to the buyer. If any of these ingredients be wanting there is no sale. In this case we can not find any mutual agreement to sell. There is no consideration fixed for an agreement to sell. The only mention of a price for the bonds is found in the clause, that on sixty days’ notice to the bank FinLy might demand either the return of the bonds, or their equivalent in lawful money of the United States as he might elect, and if he should elect to take the money, the price to be paid was to be the selling price of the bonds — not on the day of their, delivery to the bank, but on the day of their delivery to the purchaser at the market price on the stock exchange of New York. H-ence, there was no price fixed to be paid on the day of the delivery of the bonds, and the right to pay the *514 money in lieu of the bonds was not vested in the bank, but was reserved to the owner to be exercised by him alone, and then only after the giving of the specified notice. In this vital respect, the case differs from Chase et al. v. Washburn, 1 Ohio St., 244. There the right of election was in the depositary.
Again, it is provided in the written instrument, that the bank would pay to Finley the three per cent, interest it would receive from the treasurer of fthe United States on said bonds, and in addition to pay him $156.25 per annum during the time it would hold them, which latter sum should be paid quarterly, the first day of February, May, August and November each year, which would make about one and one-fourth per cent, in addition to the three per cent, accruing on the bonds. This is a clear mark of ownership of the bonds by' Finley. He alone could profit in their use, and all the bank could get out of the transaction was the right to deposit them with the comptroller as security for its circulating medium. There was no assignment of the bonds, either verbally or in writing, but they were delivered under the conditions expressed in the writings. The parties regarded the transaction as a loan, and their intention is of great consequence in construing their contracts where such ascertained intention is not in conflict with the terms of such contract. The bank did not own the bonds, because it had agreed to return them after sixty days’ notice, and if the bonds were not wanted, their value on a day when a sale could be made for the market price on the New York stock exchange would be paid, *515 and until that event no absolute title to the bonds vested in the bank, or any other purchaser.
We are satisfied that the delivery of the bonds under the contract was a bailment for hire and not a sale, and being a bailment for hire, more latitude is allowed the bailee than in cases of mere deposit. It is said by the authorities that where the bailment is one of hiring or for compensation, the bailee during the period of the hiring,, is entitled to use, enjoy and possess the subject-matter thereof in any manner contemplated by the contract, and this right is exclusive not only against third persons, but against the bailor, who has no right to disturb him. 5 Cyc., 178.
But it is urged that the title to the bonds could not remain in Finley because they were to be deposited with the comptroller of the currency to secure circulation of the bank’s notes, and that the comptroller would take title untrammeled by the claim of Finley. We think this position is untenable under the facts and the law. The treasury department does not ask or obtain absolute title to the bonds in such cases. Its title is one of security merely, and for that purpose its possession is absolute so long as security is required. But the hour when the bank redeems its outstanding notes, the department’s hold is released and the bonds return to the pledgor bank. Or if, as in this case, the bonds deposited are called by the original and real owner, and the bank substitutes other acceptable bonds to secure its circulation, the former bonds must be surrendered tc the bank. Therefore, the holding of the treasury department is in trust for the bank for a particu *516 lar purpose, and the bank being a bailee of the bonds so used, receives them back to be disposed of under the agreement between it' and the true owner. There is nothing mysterious about the relation which the several parties involved in the transactions sustain to each other. However, it is asserted here that the return of the same or identical bonds could not have been contemplated by Finley, for it was evident that to the amount of $7,500 in coupon bonds, they were to-be and were converted by the comptroller into registered bonds bearing' the same interest, and that such fact is a conspicuous earmark of a sale to the bank. And it is well to state in this connection that it is stipulated in the latter part of the first instrument quoted, that “when said bonds are returned $5,000 shall be registered and $7,500 shall be coupon.” This is an express provision that bonds of the same classes and bearing the same interest as those delivered or loaned to the bank, shall be returned in case Finley should not elect to take thefr value when sold on the New York stock exchange. As we have seen, when the executor made the election to take the-proceeds of such sale, the identical registered bonds were with the comptroller. They could, but for the election, have been returned in specie, and as the comptroller had converted the $7,500 of coupon bonds into the registered class, it was within the power of the department to re-convert the latter into coupon bonds of the same issue as the former, when others of the registered class were deposited in their place. So there was no insurmountable obstacle to compliance with the stipulations above *517 quoted. This view is demonstrated by the fact that when the executor exercised the right reserved to Finley in the contract and gave the required notice, the registered, which included all the bonds deposited by the bank, were sold for stock exchange prices arid, of course, the bank had to deposit other bonds in their, stead with the department. But for the election by the executor— the bailment terminating by the death of Finley— $5,000 of the identical bonds would have been returned, and $7,500 in coupon bonds, all of the same issue of June, 1898, could and would also have been returned. The latter might not have been the identical coupon bonds deposited, but the same kind in every respect, and this would have filled the contract between the parties. This view is in harmony with Fosdick v. Greene, 27 Ohio St., 484, and is supported by Sattler, Assignee, v. Hallock et al., 160 N. Y., 291; Harris v. Coe et al., 71 Conn., 157. Our case is fully covered by the doctrine of O’Dell, Assignee, v. Leyda et al., 46 Ohio St., 244.
Very many authorities might be cited, but in our judgment they are not needed.
It follows that the court of common pleas erred in charging the jury as requested Fy the treasurer, and also erred in refusing to charge as requested b}r the executor, and that its judgment is erroneous and was properly reversed by the circuit court.

Judgment of circuit cotirt affirmed.

Si-iaucic, C. J., Crew, Spear and Davis, JJ., concur.